The next matter is number 24-1494, number 24-1500, number 24-1586, ZipBy USA LLC et al. v. Gregory Parzych. At this time, would counsel for the appellant, Cross Appellee, please introduce himself on the record to begin. Good morning, your honors. My name is Ken Thayer, along with my co-counsel, Daniel Walsh Rogalski. We represent the appellant and Cross Appellee in this matter, Gregory Parzych. We brought this appeal to challenge three erroneous legal rulings that resulted in a tainted jury verdict in December 2023 against Mr. Parzych and in favor of his former employer, ZipBy USA and its parent companies. Those three legal errors by the trial court occurred prior to and during the trial itself and were compounded after the jury verdict entered by a subsequent error in which the trial court awarded a multi-million dollar attorney's fee award to ZipBy on the basis of contract language that we submit to your honors was inapplicable under the circumstances of the case. The first of those three errors involved the trial court's decision to allow ZipBy's expert witness, William Scalley, to offer speculative and unreliable testimony as to the alleged lost profits that were at issue as the measure of damages in the case. According to ZipBy, Mr. Parzych gave bad information about how valuable TCS would be, which then led ZipBy to pass on the opportunity and Mr. Parzych then pursued that opportunity. When ZipBy caught wind of what was going on, they fired him and brought the lawsuit. Now, with that as context, they engaged an expert, Mr. Scalley, to present lost profit testimony. In his testimony, Mr. Scalley explained that he looked at financial projections that were created in early 2020 as to what TCS would be worth and therefore what ZipBy stood to gain from having acquired it. He focused on the time period between 2021 and 2023. Well, as we all know, something big happened in that time period, the COVID pandemic. The financial projections that Mr. Scalley relied upon were created before COVID. He never looked at what TCS actually earned in 2021. He did use a discount. I'm sorry? He did have a methodology for discounting for COVID. He estimated that the effect of COVID would be around 15%. Can you explain how he did that? He stated that he used a methodology. But any methodology is only as good as the data that goes into it. Garbage in, garbage out. We all know that. The methodology that he used could have allowed for him to take into consideration the actual TCS financial data from the relevant time period. Another response to that is all sorts of things happened after, well, the jury found it, the misconduct by Mr. Parsak. So if you use the actual data, that could be influenced by business decisions that are the no fault of the victim. So it might be logical to say I'm not going to use that data because there might be influences I shouldn't consider. But I'll use this other way of thinking about COVID that excludes those. Why is that not a logical way to think about the problem? An expert witness can reach the conclusions that they reach after they consider all relevant data. Had he done what your honor is suggesting, had he looked at everything and still said, based on factors XYZ and AA, that ZIPI would have done differently than what TCS's management did, then perhaps we'd have a different circumstance. But that didn't happen. He never looked at relevant data. Was the data relevant? Unquestionably. Did he consider it? Unquestionably not. Where did he draw the line in terms of the data? Sometime in 2020 or end of the year 2020? My understanding, your honor, is that he considered, and I believe the record bears this out, he considered historical performance from ZIPI for years, I think, 2017, 18, and 19. And then a financial projection that was created sometime in early 2020 by a third party. He then extrapolated from that projection what he believes ZIPI, or what TCS, would have generated in revenue and profit in 21, 22, and 23. So he drew the line in early 2020 in terms of the data? In terms of the data, the real world data, the actual data, as opposed to projections. Yes, your honor. And when in 2020? I don't believe there's any actual 2020 sales, revenue, or cost data that was part of his analysis. I believe it's only projections from that point forward. So there was no historical data regarding the COVID period that he factored into his analysis expressly? That's correct, your honor. And because that data was not taken into consideration at all, even if only to be mitigated subsequently through other analyses, it leaves an analytical gap, and it leaves a differentiation between the existing evidence and the opinion offered, which is, according to the case law, both the First Circuit and the U.S. Supreme Court, inadmissible. It constitutes an abuse of discretion. The second and related error that the trial court committed was in excluding evidence of TCS's actual financial condition, if only to rebut Mr. Scali's testimony. But your client knew this information existed the day he filed suit, or the day suit was filed against him? It didn't exist the day suit was filed against him. He knew it was being prepared. Mr. Parzyk was aware, presumably, that TCS filed tax returns. Right. And he postponed asking for them until after the discovery period. How close to trial? The evidence that we submit should have been admitted at trial was identified in pretrial exhibit lists. So we're talking about the months before trial. It was a July deadline to identify all the documents that were going to be used. The July deadline specifically said, in your own files. That's language from the court decision. The evidence we're talking about was not in Mr. Parzyk's possession. It was never something that he had and could turn over. This is not the typical case of sandbagging, where a party holds onto something and then discloses it at the last minute at trial. This is a situation where the evidence always existed in the hands of a third party. Mr. Parzyk had reason to believe that it may exist, that it may support his position, but he had never seen it, has never seen it. He's only, he identified it as something that he could subpoena to them for the third party to bring it to trial. The fact that he didn't go out and get it does not place him in violation of the court's order to turn over things that were within his possession. Mr. Radford, I think that's his name, did testify to the performance of TSC in the operative years, right? Yes, he did, Your Honor. And his testimony... Is your argument simply the difference between the testimony and having paper to show that validates that? Is that the harm you're identifying? Absolutely, Your Honor. When the jury went back to deliberate, they had pieces of Mr. Scali's expert analysis that included the projected TCS revenues of $24 million during the relevant time period. They had no corresponding piece of paper of the actual revenues, which would have, according to Mr. Radford's testimony, revealed a number that's barely one quarter of that, only $6.4 million. Was your client prevented from asking Mr. Radford any questions about the actuals? Mr. Radford was permitted to testify as to TCS's revenue. But we're talking about a five-day trial where lots of numbers were being bandied about, multiple witnesses, and candidly, some pretty dry subject matter. When the jury goes back into the deliberation room and they're having trouble keeping all that straight, maybe they didn't take great notes, they can look at a piece of paper that has Scali's projections on it of $24 million and $1.5 million in profit, and they have no corresponding piece of paper to compare that against. I read Mr. Scali's cross-examination. This point wasn't even made. I'm sorry, Your Honor? In Mr. Scali's cross-examination, I didn't see the actual performance being discussed as a reason to discredit what he said. It was a discussion of the 2017-18-19, which were a lot lower, and the suggestion was made, how are you coming up with this, that it takes off? But he wasn't actually crossed on that point, which your client knew. Mr. Radford had not testified at trial yet. He hadn't introduced the evidence of what TCS had actually made. Mr. Parzyk's trial counsel would have been objected to had they said, do you know, Mr. Scali, that TCS only earned $1.3 million in 2021? They would have never been able to ask that question because there was no evidence. That's not how a trial goes. You could tell the judge that you're going to bring on a witness that will say this. You'd either like to bring the witness on out of order, or you'd like to ask the questions based on representations that they'll be backed up by the testimony, particularly where you're just cross-examining an expert. Presuming that, well, so to go to the testimony that actually did occur, they asked him about the bases for what he did and did not consider. They did not ask him the subsequent question of what TCS actually earned at trial. However, the fact that they didn't ask those questions doesn't negate the admissibility of probative relevant evidence. Well, it would have been the moment to challenge this methodology. I mean, your argument is analytical gap, and I posited, well, there might be reasons you don't look at that data. And it seems odd to come here and say analytical gap, but we didn't actually question him about the analytical gap because we didn't even present to him this problem. They did question him, Your Honor, about the fact that he didn't take into consideration the real data. What they didn't do, Your Honor, just to clarify the record, they didn't cite Mr. Radford's testimony about what TCS actually earned during the relevant time period. But they absolutely questioned and established for the record that Mr. Scali did not take into consideration TCS's actual financial information from the relevant time period. Going forward in the case... They never asked him to explain the difference between the... In other words, no one said to him, I want you to assume that the actual earnings are X. How do you reconcile that with your opinion that the company was generating revenues way more than X? I don't believe that question was asked, Your Honor. So it makes it hard for us to then say the lack of an answer to that question renders the testimony unreliable. Well, the testimony is based on what he did and didn't consider, regardless of what questions he was asked in cross-examination. Our position, Your Honor, and we believe the case law supports this, is that an expert's failure to consider relevant evidence can be the basis to exclude that evidence. And here, there's no question that he failed to consider relevant evidence. As my time is running short, Your Honor, I'll move forward to another significant point in the case, which is the awarding of attorney's fees under what's been referred to in the briefs as the IP Agreement. The IP Agreement, by its terms, permits a limited recovery of attorney's fees by zip-by, where those fees are incurred in enforcing the covenants of the agreement. That IP Agreement was not part of the case when it was filed. The case was filed in May of 2020. An injunction was sought and obtained under that original complaint, and it wasn't until March of 2021 that the complaint was amended to add the IP Agreement to the case. So what that means is the relief that zip-by sought in the case, both on a preliminary basis and ultimately through trial, was based on common law fiduciary duties and the alleged violation of a separate employment agreement that barred Mr. Parzyk from competing or taking business opportunities from zip-by. The IP Agreement was only added subsequently, and at no point, neither the damages nor the injunctive relief that ultimately entered in the case stems from that agreement. Instead, it all stems from the common law fiduciary claims. Well, didn't the jury find a violation of the IP Agreement? The jury did. The jury also found a violation of the trade secret statutes, which the court threw out. And that was thrown out, but are the extent of those exactly the same? They are substantively the same for purposes of this case, Your Honor. Are you arguing there are no other covenants in the IP Agreement besides the don't misappropriate trade secrets? There are no covenants in the IP Agreement that bar Mr. Parzyk from competing with zip-by. There's no covenants in the IP Agreement that impose any fiduciary obligations on Mr. Parzyk. The purpose and scope of the IP Agreement is to prevent the misappropriation of proprietary data, trade secrets, and intellectual property. And those things are not implicated by the judgment that's entered into this case. The first sentence says he has to work in the best interests of the company. That's the very first sentence of the agreement. The IP Agreement. The IP Agreement. That's the first sentence. Then there's a lot of other stuff, but that is the first sentence, which seems to be what this case is about. The case is about his breach of a fiduciary duty. That sentence does not impose a fiduciary duty on him to refrain from the activities, particularly in the context of everything else that follows that talks exclusively about intellectual property and not about competition, which is addressed in the separate agreement. Whether the financial data that was received by Q-Free is considered a trade secret or not, it was marked confidential. It was given to zip-by. It was used by Mr. Parzyk in a way that's inconsistent with zip-by's interest. So wouldn't that be a violation of the IP Agreement? The information was given to Mr. Parzyk, however. Q-Free and TCS controlled that information, not zip-by. He didn't steal it, but he used it in a way adverse to zip-by. He used information that was provided to him by Q-Free and TCS. That's true, Your Honor. That was confidential information in zip-by's control. It was separately provided to zip-by. And for those reasons, Your Honor, we request that the trial court's decision be vacated and the case be remanded for a new trial. Thank you. Thank you, counsel. At this time, counsel for the appellees, cross-appellants, please introduce themselves on the record to begin. Good morning, Your Honor. John Cotter from KNL Gates for the appellee plaintiff zip-by and TMA companies. We're also a cross-appellant on the trade secret issue. If possible, if the court will permit it, I'd like to reserve a minute for rebuttal on the trade secrets if there's time. Your opponent didn't ask for rebuttal, so you have all the time right now. Okay, thank you, Your Honor. And there will be no rebuttal. So this is a jury trial, and it seems that the appellant would like to revisit the strategies taken at the jury trial. On the first point regarding the lost profits analysis by Expert Scali, Mr. Scali was evaluating the loss to zip-by in 2020 when the opportunity was taken away from it by Mr. Parzyk's actions. And Mr. Scali evaluated that based on the information available at that time. But wait, this is a trial with a damage claim, and the damage claim is predicated on loss as of the time of trial. Well, what he did is he did it – the loss was effectively what zip-by lost at that time. It would have had the business at that time in 2020 and would have been able to take advantage of its own expertise in the field. And there's testimony about that in the record. But it seems like – maybe I'm missing something. It seems like he used historical data up to the point of the pandemic, and then he stopped using historical data and came up with something, some 11.4 percent enhancement for each year. That's sort of odd, why you would use historical data for the non-COVID years but then ignore the losses that occurred as a result of COVID. Well, I disagree, Your Honor, that he ignored the actual situation. He did consider it and factored in the COVID matter and how that impacted businesses in a number of articles, treatises, the things experts rely on. He testified about that and considered that in determining what the value was of the loss to zip-by and also – But he did that without looking at any historical data at all. He only had the data he had. Well, that's just because he didn't ask for the rest. No, we asked for it, Your Honor. We asked for it. You didn't ask the company that had it for it. We did actually depose Mr. Radford, and we asked him for whatever data he had, and he supplied whatever he – he didn't really supply any data. The company was what, TCI, TSI? TCS. Did you serve a subpoena on them for their financial records? We did in 2020. We served a subpoena on them and took discovery from them. That's not going to get the years at issue if you served it in 2020. Well, we had a discovery deadline and discovery closed in 2021. This isn't a matter of turning a blind eye, Your Honor. In fact, it's interesting that we're talking about data here from TCS, which Mr. Harzik did not even present at any time. He didn't present it in his automatic disclosures. He didn't present it in discovery. He didn't present it in an expert report. He didn't do one. He didn't present it in the run-up to trial. It's by the July deadline. He didn't present it when he was – when he put it on – he said he was going to provide information about actuals. He didn't say what those actuals were on his pretrial list in October, a month before trial. And when he argued in opposition to the motion in Limine to exclude any actuals because they're so late, he didn't even present any evidence at that point. But I guess our job is to look at sort of baseline reliability of your expert. And so I think you need to answer two questions for us. One is the analytical gap that our discussion today has identified. Was that too big of a gap or not? And then secondly, SCALI's projected revenues during COVID seem to be dramatically higher than what the actual revenues were. Can you account for that in some way to show us that the testimony itself was reliable? Yes. Well, first of all, there is no analytical gap. Mr. SCALI testified that he followed the procedures that a damages expert would follow in determining what was the loss to zip by. He went through that. There was detailed testimony in it. There was an expert report beforehand that laid out what he was going to do. And then he did it. He answered. Wait, wait, wait. At trial, he testified as to the years his damage analysis included 21, 22 and 23. And the impact of COVID on that. Yes. And he never looked at the historical data for those years at all. So how could he explain how it was different and why we should ignore it? He didn't ignore it. There was no data. Well, yes, there was. The company had it. You just didn't. No, it was never. Your Honor, I must disagree. It was never presented. We asked the witness at the witness at trial, Mr. Bradford. Are you saying TCS did not have tax returns? It didn't provide any. It didn't have it. That's not my question, counsel. Are you saying that TCS did not have tax returns? We don't know that they do. There was they were never presented. That's that's the point. Another way of saying that is you never asked TCI for them as of the time of trial. We had asked for TCS to provide information. We had asked for Mr. Parzyk to provide information. Did you ask TCS to provide their tax returns as of the time of trial? No, we didn't go back after after discovery was closed and asked for more discovery. You couldn't have got them if had you not asked. You could serve a trial subpoena. I understand, Your Honor. We did not serve as a trial subpoena. But the other point is that Mr. Scali considered the effects of COVID on businesses. He was trying to determine the value that was lost to ZipBuy in 2020 when it didn't get the opportunity to purchase this business. Had ZipBuy purchased this business, as Mr. Karam, its CEO chairman, testified, it would have applied to all the businesses it acquired. It's worldwide scope. It's existing business. The damages were not based on the value as of 2020. They were based on the value as of trial. Exactly. The damages were what Mr. Scali estimated at trial, yes. And he was aware of the possibility that TCS would have different returns. But he factored that into his analysis so there is no analytical gap in response to Judge Montecalvo's decision. There is no analytical gap when he considered using the same kinds of analysis that experts use in cases to determine the value of a business that was lost. He considered that. And he considered the data that's available for the effects of COVID. And that does not include whatever it is that Mr. Radford in running TCS did. And he admitted he basically stopped doing any marketing. He stopped investing in the business. That was all information that was considered. Are you saying it's generally accepted among damage experts to value a company without looking at its tax returns and its profit and loss statement and its other financial data? There's no requirement to look forward when the analysis is relevant. There's no requirement for that. What does that mean? The analysis is relevant as of the time of trial. Right, Your Honor. Are you saying there's any other expert on the planet who would value a company as of the time of trial without looking at the actual profits and loss of that company for the three years prior to trial? The three years prior to trial where the business was a different business run by Mr. Radford and basically the testimony from Mr. Radford himself is that he pulled the plug on investing in the business. I mean, he could have said all that, maybe. He did. But the expert could have said all of those reasons. But the problem here, I think, is he didn't get to reasons. He just didn't proceed to get the information to figure out whether there were reasons. So I think that's where the idea of analytical gap comes from. It's one thing to get information, examine it, and say, I am consciously not relying on this because Radford drove the company into the ground. And if he said that, that's one case. But I think the point is this case, he didn't get to that because he just said, I'm just going to rely on what they told me their hopes were, and I'm just going to rely on hopes instead of what happened. And the problem is he didn't analyze it. He just said, I'm going to do this and not that. Well, there's a good reason not to analyze it, and that is that it's data that's basically tainted by Mr. Radford's behavior. And also, Your Honor, there was other testimony about value here in the case. Who ran the company during the years that your client did consider historical data? Excuse me, Your Honor? Your client considered historical data, in fact, relied very heavily on it for the years 18, 19, 17. Who was running TCS then? It was Q-Free with Mr. Radford and others involved. A bigger staff in TCS's operation and also the mothership of Q-Free, which is a worldwide organization that was supporting it. And the projections were based on that. So those projections were more like the situation of ZipBuy, a worldwide organization owning TCS and operating it, than they were like Mr. Radford, an individual who was cutting all investment in the company running it. I didn't see, and maybe because the transcript and the appendix didn't have it all, but I didn't see your expert offer that as an explanation for ignoring the actual profit loss and tax returns. The explanation of what, I'm sorry? That you just gave. No, he relied on all the... Radford was both in history and in present, but he had a different role. And there were other people who were running the ship better. Well, that evidence wasn't in the record at the time when Mr. Scali testified. It wasn't in the record for the jury to consider because Mr. Radford testified after Mr. Scali. I didn't know that that was Scali's reason for ignoring the actual data. I didn't say it was his reason. I said that was a factor that the jury could consider. And we also have Mr. Karam who testified very specifically about the value of TCS to him to be able to buy it and fold it into the ZipBuy TMA worldwide operations. If we narrow this down, your answer is the reason it wasn't considered is it wasn't in discovery and he didn't have it. Correct. That is your argument. That's just regarding Mr. Scali's very specific facts he had regarding TCS. But the reason he did not consider historical data from 21, 22, and 23 is he did not have it. Nobody had it in the case. It was not part of the case. That is his reason. It's not Radford ran it in the ground, synergies provided by ZipBuy, all of these kinds of things. It's not that. It's he didn't rely on it because he did not have it. He didn't rely on it because it wasn't as relevant as the information he had which was the projections based on the larger... Do you think I can find him saying that somewhere in his testimony or somewhere? Yes, you can. And it's in the testimony of both Mr. Karam and of Mr. Scali about the value of TCS to ZipBuy had the acquisition gone through in 2020. And Mr. Scali also considered the impact of COVID as a general matter on businesses. If I may turn to the, if you have any questions on any of Mr. Parzyk's appeal issues beyond what you've asked. I'll skip to our cross appeal. Thank you, Your Honor. And so it was a legal error by the district court to basically insert the district court's own view of what facts it would like to see in determining that there was the jury's verdicts on trade secret misappropriation both under federal and state law were to be overturned on J-Mall. And the reasons that those decisions... Yes, Your Honor. Because there's a million dollars in punitive damages at stake on that. And there's also the potential for further attorney's fees because the judge discounted the attorney's fees claim in part because of the trade secret, or because of the trade secret claim. Can I ask you this question? So set aside Parzyk's motive for disclosing a Q-Free that ZipBy wasn't interested in acquiring in the acquisition deal. Was Parzyk's disclosure of the board minutes to Q-Free still pursuant to his legitimate employment duties as you think of that element in the trade secrets? Yes. And it's not his disclosure that's a problem. That was under the veil of the Q-Free-ZipBy confidential relationship that Mr. Karam testified about. And as furthered by the NDA that Q-Free forwarded to ZipBy in order to protect that information. It wasn't Parzyk's disclosure to Q-Free that was the problem. That was authorized. It was his use of the information for himself while he was still an employee of ZipBy and obligated to operate in ZipBy's benefit both under fiduciary duty and other various contractual restrictions. And that is where the violation took place. Do you agree that to recover the attorney's fees that you recovered, you need to establish there was a breach of a duty under the IP agreement? Right. And under that, going to Judge Afram's point on the appellant's arguments, the IP agreement was mentioned in the original complaint, was added to the amended complaint specifically when we got the signed copy, which had existed, but we just hadn't been able to find it. It includes provisions about confidentiality of customer information and any other information entrusted to Mr. Parzyk. And those were all breached. And there was an injunction entered under all the claims after the conclusion of trial by the judge. So it's not true that the injunction was limited to fiduciary duty or to one provision in the employment contract. The injunction was broader than that, and it covered these other provisions, Section 1 and Section 2 of the IP agreement dealing with confidential information of ZipBuy or its customers. Can we just aggregate the two kinds of so-called trade secrets in this case? So the financial information from Q-Free, how is that licensed to ZipBuy? So I understand a license to be like, I get an ownership interest to use it for some way that's really beneficial to me. And I feel like this may have been confidential information provided to do a due diligence analysis of the company, but that doesn't strike me as the kind of ownership. So I understand licensing is a way you can own a trade secret, but how would I think of this as a license of that information? Well, I think you've actually stated what the basic facts are. It was information provided by Q-Free in the context of the business relationship between ZipBuy, TMA, both of them, and Q-Free, which had been existing and required information that was exchanged between them as any two business partners would be to be kept confidential. And is that enough to be a license? Yes, because a license, the statute does not require a written license. It doesn't require an exclusive license. A license is simply you give me permission to do something with your information in this case, and I keep it confidential. Is that necessary just to look at it and think about it? Well, it's confidential information that's very important to Q-Free, and providing it to analyze it in the context of a deal is not, I don't think, a casual situation. It's a very concrete business relationship with a need to keep that information confidential. Q-Free was not blasting that information all over the place. It was giving it to ZipBuy, a known, trusted business partner, to give ZipBuy the opportunity to consider it and buy the company, the TCS company. So it's a circumstance within the two companies' relationship of confidentiality and trust that Mr. Karam testified about, and the need to keep it confidential and use it only for ZipBuy's business purposes is part of that relationship. That's what Q-Free gave it to ZipBuy for. Again, not just that it was proprietary and confidential, also that it was only delivered to ZipBuy, and also that there's the NDA that followed the information a few days later, and the NDA drafted by Q-Free says all that we've done here since even prior is considered confidential, which is consistent with their ongoing relationship and shows Q-Free's intent that ZipBuy keep that information confidential and use it only for the possible deal. So that's consistent with a license arrangement. So this conflates, though, it really does conflate the breach of fiduciary duty conduct and the trade secret conduct. I mean, in your theory, they really are sort of one and the same, right? If I'm going to do this, I'm going to look at the materials to make a decision to not, you know, lie to my company so I can get the opportunity, and so they really become the same thing? Well, they rely on a lot of the same facts on different law to some extent, but Mr. Parzyk, there's plenty of testimony in the record and cited in the briefing, that he did these many bad acts, as we've alleged, and the jury found they were there. They happened to violate multiple different laws, including trade secret law, including fiduciary duty law, including breaches of various contracts. And, you know, the fact that they violated multiple things, there's no reason that he can't be found violative of all the acts, all the different acts and legal requirements, even though there may be some similar facts. There are different laws that are applied to the same facts. I mean, in your Rule 29, you sort of acknowledge this is kind of an out there view of trade secret, and that's, I guess, what I guess I'm still uncomfortable with, which is this idea that it's not like he took the formula and started a new technology company and built the new technology with Q-Freeze's formula. He basically just was able to look at and evaluate what I like, TSC. And is that really what we're supposed to be getting at with this? Sure. I think it is actually, Your Honor, because the trade secret definition is broad. You can read the DTSA, the federal statute. It includes financial information. It includes, in case law, it includes a decision to go forward with a business or not. That is strategic information that's important to a company, and whether or not it's not the same thing as a complex technical formula, agreed, but it is confidential information to the company. It doesn't reveal that to the public. It doesn't want its competitors to know that. It doesn't want Mr. Parzyk to take it and go form a competing business or take an opportunity away from them. It's valuable not only to ZipBuy. It's valuable to the competitors of ZipBuy if they knew that. They would want to know it. It's valuable to Mr. Parzyk, which is proven by he went and negotiated a deal that was at a lower dollar value than was proposed to ZipBuy. So there's no doubt about the value, and just because it's not a technical trade secret or in the case of the decision by the board, not some detailed financial analysis, it still fits within the statute. Okay. Thank you. Thank you, Your Honors. Thank you, Counsel. That concludes argument in this case.